The Honorable, the judges of the United States Bankruptcy Appellate Panel for the 8th Circuit. Hear ye, hear ye, hear ye. The United States Bankruptcy Appellate Panel for the 8th Circuit is now in session. All persons having business before this honorable court may now draw near and they will be heard. God save the United States and this honorable court. Be seated, please. The first case scheduled for argument this morning, Friday, August 12, 2016, is case number 16-6008. In re, Michael Robert Wigley. Lariat Companies, Inc. v. Michael Robert Wigley. Mr. Anderson? Thank you. Good morning. Good morning. May it please the court, my name is Curt Anderson. I represent the appellant, Lariat Companies, Inc., in this appeal. This is an appeal from a plan confirmation order and a previous order declining to dismiss or convert the case based on an allegation of bad faith. Call it the confirmation of the fourth plan? Correct. That's correct. The actual contents of the fourth plan are not an issue, but a reversal would necessarily vacate that confirmation order. Lariat is asking, of course, in its brief, for a reversal and remand. The single issue it raises, of course, is what I just stated, whether the bankruptcy court erred in denying its motion to dismiss or convert the case from Chapter 11 to 7. While findings of specific fact, which are generally undisputed in this case, are upheld unless clearly erroneous, the Eighth Circuit has recognized a distinction applying the same standard between what it terms specific facts and what it terms ultimate facts, and that was in the Addison case. In the Third Circuit, the SGL Carbon decision has put it somewhat differently, saying that it looks at the fact finding and then it examines the totality of facts and circumstances to determine whether they support a finding of good faith. The court did a summary dismissal order where it basically said the facts are well known to the parties. I assume they may be well known to the court, too, but I will review them unless you decide that you don't want to hear it. In 2008, the debtor gave Lariat a personal guarantee on a real estate lease. Counsel, I do mean to interrupt you. I apologize for interrupting you. Before we get too far down that road, there's one thing I'm not clear on from the record, at least that I've seen. Did Lariat object to the fourth modified plan? No, not in terms of its contents. Okay. So how is Lariat an aggrieved party with respect to the order confirming the fourth amended plan? Only in the fact that it went to confirmation at all, that it was denied its motion to dismiss or convert. Okay. But if I'm remembering Eighth Circuit law correctly, in order to be an aggrieved party from a confirmation order, you have to have objected to it. And you're saying Lariat did not object to the confirmation order in this case, the fourth amended one, I should say. No. All of its previous objections to the contents of the plan had been accommodated. So the only objection it would have had was the one that sort of like asking for an exception in a trial. It's well in one position that basically it felt the case should have been dismissed or converted in the first place. Okay. If we were to affirm the decision confirming the fourth plan, your motion to dismiss falls away, doesn't it? If you chose to dismiss based on the fact that somehow we hadn't preserved our bad faith issue, that would be the case. I would respectfully submit to the court that we have sufficiently preserved that issue. I think you certainly preserved your motion to dismiss appeal. Correct. But doesn't confirmation of the fourth plan subsume the dismissal issue? Well, it finalizes the dismissal issue for sure. But I don't think anybody in the bankruptcy court had any illusions other than the fact that that was still a live issue awaiting appeal at the proper time. And in fact, we had actually prematurely filed an appeal on that one. Procedural point, I hope I've addressed it as best I can. Well, let me just move on unless the court wants to go into further detail on that. In 2001, the debtor was held liable on his guarantee for $2.2 million. A second state trial court judge found that in the same time period, Lariat, excuse me, the debtor fraudulently transferred $795,000 to his wife, finding of actual intent, actually conclusion of law, actual intent. The debtor had big issues, and I'm sure we're going to hear a lot about them today, about how he should have been credited for mitigation of the lease. That issue was presented to the original trial court judge, another trial court judge. Three judges of the Court of Appeals went nowhere. What does this have to do, though, with anything related to bad faith in the bankruptcy filing? I mean, I guess I'm a little confused. A lot of the facts and the documents that you presented to the bankruptcy court related to issues that occurred prior to the filing. Are you suggesting that action taken pre-filing automatically results in a bad faith bankruptcy filing? Not automatically, but it goes into the mix of the totality of facts and circumstances. The fact the debtor has an issue about that would not be per se or probably even contribute to bad faith. So his continued litigation in state court and then going into bankruptcy court to avail himself of whatever remedies he may have there, explain to me how that correlates to bad faith. Sure. Well, it's one ingredient in the mix. By itself, it may not, but there's a lot of other things. How many ingredients are in that mix? Well, let me address the one you raised first of all. Legitimately, the debtor can make, of course, his arguments in state court as he wishes, go up on appeal. But then to turn around and collaterally attack it, go find a second judge, put Lariat through that pace. And then after he's lost the issue all through the state courts to continue, if I can use the verb, perseverate on the issue, in bankruptcy court, well, first of all, I think very significant is the fact that there was this collateral attack that had to be addressed. And then when that failed and other things failed, he went into bankruptcy court. Again, we're just talking about one ingredient in the mix right here now. And then I know the debtor will disclaim any effort to violate Rooker-Feldman. I asked this court to violate Rooker-Feldman. But I think this is a very artful attempt to pull at the court's heartstrings at least and to find a way. The court doesn't have to formally sit as a court of appeal. It has to, in the words of the Supreme Court, reject that finding. And I think he's asking the court to reject that finding. Don't look at me when it comes to Rooker-Feldman. I'm sorry. I'm sorry. We've all had our experiences with Rooker-Feldman in the Eighth Circuit. Let me back up to what Judge Chaudine was talking about here in the representation. As I understand the record correctly, at least, debtor asserts that your client re-let the premises between the time the judge or before the judgment in state court was entered. And is that ‑‑ it was unrebutted, if I understand correctly. Is that a true statement? Did your client re-let the premises? At a certain point in 2011, I believe, again, from approximate memory, April of 2011, they did re-let to another restaurant company. Okay. And never informed the state court before it entered its judgment that it had done so. As far as I know, not. Now, let me put a big disclaimer on this, which is I'm relying on the fact that this whole leasing file was put in front of a total of five state court judges. Don't misunderstand my question. I'm not saying that issue hasn't been ‑‑ the nail's flush with the board on that issue, as far as I'm concerned, from a legal standpoint. And this may be a slightly nuanced argument, but it seems to me that if that, in fact, happened, as debtor testified it did and went unrebutted, wouldn't that justifiably upset the debtor that your client hadn't played fair in state court and got a judgment significantly or potentially larger than maybe it should have? Again, I'm not talking about from a legal standpoint. That was dead. But from the standpoint of a debtor who is told he owes $800,000 and finds out that your client kept information from the state court that might have significantly or at least partially reduced that obligation, don't you think he had a right to be upset with the system and continue to fight it as hard as he could to try to make it right? Part yes and part no. He certainly had ‑‑ anybody has a right to be upset, but what's the appropriate response to that being upset? He got the whole leasing file. He put that whole file in front of the original trial court judges. Right, but I think the question goes more to you got a $2.2 million judgment. Right. And then Mr. Wigley availed himself of remedies under the bankruptcy code to reduce that amount that he thought was unfairly high because you had relet the premises, I guess. So, you know, whether or not, you know, forget the state court part. There was a $2.2 million judgment. He went into bankruptcy court and under 502B6 that amount was reduced. What's the bad faith about that? Invoking 502B6 by itself is not bad faith. Invoking 502B6 with no benefit to the creditors, with no benefit to other creditors, the policy reason behind 502B6 is to make sure that a landlord like Lariat doesn't gobble up the whole pot. Well, this is a 100% pay plan on allowed claims. Did you raise that argument in front of the bankruptcy court? I don't recall seeing it. There's numerous passages where basically I point out the fact that all creditors are being paid in full, and I think it was raised in connection with the previous claim litigation that this court has also seen. So it was there. In addition to that- But if it was a 100% plan, isn't that why the debtor showed good faith by using 502B6? It had to pay less money to the bucket of unsecureds. Isn't that a right? Well, he filed the bankruptcy showing positive net worth even before any- including contingent debts, which he wasn't going to pay anyway. But putting those on the debit side and putting the entire Lariat claim prior to any claim limitation on the debit side, he had positive net worth. He did not invoke 502B6 to benefit his creditors. But isn't 502B6 one of its purposes that a large creditor such as yourself can't dominate the voting process as well? Well, of course, with a 100% paid plan, there's really no voting process. Right. So, you know, Knox Mix is- Yeah. It's really there, and I think there's plenty of case law to back this up. There was claims litigation over it. It's there to protect the other unsecured creditors. In this case, they didn't need it. The only person that's benefiting from this is the debtor. So, once again, another ingredient to be placed in the mix along with things like- and I put a number of other things in my brief. The final section has quite a litany of them. You know, not disclosing the fact that his wife was a co-debtor, requiring us to find out that, in fact, we were the only ones hanging out without complete co-debtor coverage. We have partial co-debtor, of course, as a result of the fraudulent transfer litigation. I see that I'm- I think I'm- I appreciate the question. I think I'm focusing on the things you wanted to principally discuss. I'm moving toward my rebuttal time now. I would just ask that the court- I apologize if I overstated the case in the brief, but I do think this is a serious misuse of bankruptcy. There is no benefit to anybody in this case except to Mr. and Mrs. Wigley personally. And I would ask that the court consider the detail in the brief, which I'm unable to repeat in this- We've read them. We've read them. You're okay there. And weigh the totality of circumstances and hold that this was a bad filing. Thank you. Thank you. Thank you. Mr. Nesset. Good morning. Good morning. Thank you. May it please the court, my name is Joel Nesset. I represent Appellee Michael Wigley.  It sounds like you're quite familiar with the pre-petition litigation and what the fight was. So I won't go into that. Suffice to say the parties, there was acrimonious litigation, a significant history of it. Do you think that these appeals, the appeals of these three orders, moots the current appeal to the Eighth Circuit on the denial of confirmation of Plan 2? You mean the appeal? Yes. I believe, yeah, the appeal of whether it was a final order, whether it was in their order. Yes. I would . . . I think so. I don't see why it wouldn't . . . Well, we'll ask Mr. Anderson on his rebuttal. His finality of orders in bankruptcy court is something that I . . . We struggle with it as well. I do want to . . . I should say, and I meant to say this to Mr. Anderson, just to clarify something. It's at least my position, and I think my fellow judges join me on this. A final order doesn't make previous interlocutory orders final. It simply makes them reviewable in connection with the final order. There's no magic wand that gets waved over an interlocutory order. Once an interlocutory order, always an interlocutory order, we're simply allowed to review it in connection with a final order if it was one of the events leading up to that final order. And I freely recognize that that's OCD and everything else, but just so you know where we're coming from on final orders, we keep trying. Do you know what the status of that appeal in the Eighth Circuit is at this point in time? Is it still pending? Under advisement. Okay. Not pending. I have not heard anything on it. I could ask Mr. Anderson. Well, if that didn't sidetrack you . . .  It's arcane, to say the least, in my opinion. I would say this is not a complicated case. The issue is, did the bankruptcy court err in finding that the debtor filed this case in good faith? That is a factual determination, and the bankruptcy court's findings of fact cannot be set aside unless clearly erroneous. There is just nothing in this record, and I mean that literally. Lariat has pointed to not one piece of evidence that would support a finding of bad faith. Mr. Ness, if I understand correctly, Lariat's argument is it had all these documents that it introduced, and if you read those documents with an eye toward finding bad faith, you can find bad faith. Again, his argument. He can clarify when he's back up, but let me just finish this. If you read those documents with the correct eye or with the correct approach, you can view them as demonstrating bad faith. If I understand correctly, you then put your client on the stand, and he explained, in his mind, explained away any perception of bad faith, and then there was no further rebuttal. So the bankruptcy court is looking at documents and looking at live testimony, and it went with the live testimony and the debtor's explanations and accepted the debtor's explanations, did it not? That is correct. My point is there is a voluminous record we stipulated to admissibility of, I want to say it was 89 exhibits, and I submit you could read every last page of those exhibits and you could look at every last page from every different angle and you could take as many quotes out of context as you want and you will not find evidence of bad faith. There is no evidence of evasive conduct in the state court litigation. There is not one allegation. Doesn't the appellant assert or at least want us to adopt the theory that his continued litigation of the same claim, maybe not while being evasive, was at least a delay tactic in terms of preventing collection? That may be it. If that's the case, then they're making a legal argument. They want you to adopt a presumption that pre-petition litigation is in itself dilatory. They don't cite any threshold that would have to be reached. But they say it's an affront, in a sense, to go up the ladder in state court and then start all over again in bankruptcy court. I would disagree entirely that we did not start over anything in bankruptcy court. Mr. Anderson brings up Brooker Feldman. That is completely irrelevant to this case. But didn't your client attempt to do something through the bankruptcy that could not be accomplished in state court, which was protect his wife from collection efforts? I'm unclear about some of the stay issues, which relate to a different appeal, but I'm just not. The things that occurred both before and after bankruptcy do seem to be designed to benefit Mr. Wigley and his spouse. There was a proposed settlement of the fraudulent transfer action as part of the plan of reorganization. And does that benefit Mrs. Wigley? She obviously thought so. She agreed to the settlement. It would put an end to that litigation. That was an entirely reasonable... But she wasn't a debtor. No. So she's trying to settle something in the context of the bankruptcy. Her husband is trying to settle it on her behalf, which obviously didn't happen in the state court, so they were preventing Lariat from continuing collection from her on that amount. Had the settlement been approved, that is correct. It was fully disclosed. I don't see how that can be bad faith to attempt. That would have benefited the estate. The bankruptcy court ultimately decided it was not necessary to fund the plan, but I can't see how that's bad faith to propose a settlement as part of a plan. It was going through the approval process, and when it was not approved, we lived with it. We made modifications to the plan. Among others, we also increased the... But didn't Mr. Wigley use the bankruptcy process to obtain stays by the state court in the litigation? No. Well, the automatic stay applied. To him. That's correct. And Mr. Wigley was a named defendant in the fraudulent transfer action. So the automatic stay did apply to the fraudulent transfer action. To him. To him. And I was one of the only appearances I made in the state court was shortly after the bankruptcy filing, a telephonic hearing with Judge Rosenbaum. And she decided, I believe Mr. Anderson may have been on it, but this is getting into the weeds. She decided that it was agreed that the stay applied to claims against Mr. Wigley, and it was agreed, I can't quote language, but that the entire case would be stayed. No motion was ever brought to extend the stay to Mrs. Wigley. I do want to talk about what I think Lariat's central theory on appeal is, and that is that the debtor was not in financial distress. And there, I don't think there's any dispute that there is no evidence in the record that would support that allegation, that argument. The evidence, the material evidence, is uncontroverted. They had a judgment in the amount of approximately $2.4 million. And under Minnesota law, that judgment was accruing interest at 10% per annum. By February 2014, that would have been $3.25 million. Mr. Wigley has resources, but he certainly could not write a check for that. There is no dispute that his bankruptcy schedules accurately estimated fair market value of his assets to be approximately $4.6 million. The state court had ordered Mr. Wigley to disclose and turn over all non-exempt property to be liquidated in satisfaction of Lariat's claim. And at the August 4th hearing on this matter, Mr. Wigley presented a liquidation analysis, testified regarding that analysis, and his estimate was that if he liquidated all of his assets over a 90-day period, he would realize approximately $2 million. These facts, I cannot imagine anybody reasonably saying that that is not financial distress. I mean, the threat of liquidation in itself to any extent, I believe, is per se financial distress. There was no suggestion that Mr. Wigley would be able to pay this judgment out of his cash flow, if I'm understanding correctly. If that's what we're talking about, he would have had to liquidate in order to pay it off. There is no doubt, and even on appeal, I believe Lariat takes that as a given. I think that's the only way you can read their argument. They did not present any evidence that cast any doubt on Mr. Wigley's liquidation values. In other words, they offered no alternative. In fact, Lariat never offered any testimony. None of the allegations that they ever made in their motions were verified or made pursuant to any declaration on personal knowledge. So they have no testimony of any kind to support these claims. What they point to is Mr. Wigley's statement of what I would consider the obvious, that a creditor could realize more than what Mr. Wigley estimated the value in liquidation to be. In other words, it's conceivable that a creditor could recover more than that. From that, Lariat makes an enormous leap to say any reasonable creditor would take a patient approach, obtain expert assistance, and receive normal market values for the asset. I don't see that there was any evidence that would say that they would receive normal market values. That is completely without any support in the record. And so they are asking this court to adopt what apparently is an irrebuttable presumption that there is absolutely no difference between fair market value and liquidation value. In other words, liquidation cannot. Well, Justice Scalia told us otherwise, didn't he, in BFP? I think that the authorities holding otherwise are legion. It is the entire purpose of Chapter 11. It is based on, I don't remember which cases we cite, but you can go on West Lawn and find dozens that say the purpose of Chapter 11 is to preserve going concern value to prevent piecemeal liquidation and the loss of value through liquidation. But Lariat is making that argument. There's no other way to read it. They are saying, yes, we were going to liquidate everything, but it wouldn't matter because we would have taken a patient approach and gotten a fair market value for these assets. And just to make sure we're all clear on this, there was no testimony from anyone on behalf of Lariat regarding how they would intend to conduct a liquidation. No, none. This is all argument. This is all based on the debtor's testimony on Cross, which he said, yes, a creditor might realize more than the $2 million I estimated. Now, he also did say on redirect, he had reason to doubt that Lariat was a reasonable creditor, and Lariat did not present any evidence that would suggest otherwise. So I see my time is up. Thank you, Mr. Nesson. Thank you for your time. Mr. Anderson? Looks like you have 2.38 left. Yes. First of all, a technical point. I had the same question you had, which is what about that pending appeal up in the Eighth Circuit? It's a Hornbook law that an appeal from a non-appealable order does not divest the trial court or the lower courts of jurisdiction to do anything. I wouldn't be bothering you or the Eighth Circuit with that, except that the Third Circuit holds that you do have to appeal from a non-dismissal, and the Eighth Circuit hasn't definitively said otherwise. I think both Mr. Nesson and I will agree that the Eighth Circuit is going to say, no, BAP was right, this is not appealable. In the meantime, if I'm wrong, I've got a jurisdictional problem, so I'm kind of stuck with that. There was an old 1895 Eighth Circuit case on point. Rather than take you there, it's examined in an Arkansas case called Westridge, 118 FRD 617, 118 FRD 617. And then there's also a Moore's Federal Practice section, volume 20, 303.32, that addresses that. I think to get to the main point that I need to make on rebuttal, Lariat never got the chance to form an intention on how it was going to go about liquidating. It had a big judgment to collect. It obviously in its own interest wanted to maximize value. Mr. Wigley's evidence is that a reasonable creditor would do that. Now, his basis for thinking Lariat was unreasonable is not supported by the evidence. Well, unless Lariat, in fact, did not tell the state court that it had relet the premises and given him this nugget of concern or legitimate issue about whether or not Lariat was playing fair with the court, how would it play fair with him? Well, how can we even know that when they're not even disclosing assets? There was 10 or 11 days between the order for disclosure and the petition filing. There was no time to form a bad intent there. You know, the SGL Carbon case talks about premature bankruptcy filings. If his basis for filing is that he thinks Lariat is going to clean him out, why doesn't he offer some cooperation? Why doesn't he see what the tentative actions Lariat takes are? I mean, between January 31st and February 10th, 2014. Well, I think the bankruptcy court did hear evidence about some of the things that preceded the bankruptcy filing, and obviously they gave credibility to Mr. Wigley on those points. But there's uncontested facts, too, collateral attacks, fraudulent transfers. You know, I mean, which way does it tip and how heavily does it tip? That's the question. I see my time is up. Unless the court has further questions, I'll sit down. Thank you, Mr. Anderson. Yes. Thank you.